BOWMAN (HAGGETT v.). See Case No. 5,900.

BOWMAN (LAWRENCE v.). See Case No. 8,134.

BOWMAN (MARIPOSA COUNTY v.). See Case No. 9,089.

BOWMAN (PETERS v.). See Cases Nos. 11,028 and 11,029.

BOWMAN (UNITED STATES v.). See Case No. 14,631.

BOWMAN v. WAGNER. See Case No. 14,174.

---

## Case No. 1,740.

### BOWMAN et al. v. WATHEN et al.

[2 McLean, 376.] [1]

District Court, D. Indiana. May Term, 1841. [2]

PARTIES—PROPER PARTIES—DEED — CONVEYANCE OF LAND HELD ADVERSELY — RIPARIAN RIGHTS — NAVIGABLE WATERS — FERRY — NATURE OF GRANT OF ASSIGNEE OF EQUITY — JURISDICTION —DEED—RIGHT—RESERVATION — CONSTRUCTION —LIMITATION OF ACTION—NONRESIDENT—PRINCIPAL AND AGENT—NOTICE TO AGENT.

1. All persons whose interests will be affected by the decree should be made parties, if within the jurisdiction of the court. And, in that case, the want of jurisdiction over them should be stated.

2. Where the proper parties are not made the court will, generally, suspend the decree, and direct that proper parties be made.

3. That persons are unnecessarily made defendants does not oust the jurisdiction as to those who are properly before the court.

4. An objection, that some of the plaintiffs have no interest, can not be made at the hearing.

5. By the common law land held adversely can not be conveyed.

6. The right of a proprietor, bounded by a navigable river, extends to high water mark; if the river be unnavigable, to the middle of the stream.

7. By the common law rivers are only navigable as high as the tide ebbs and flows; this not so in this country.

8. The riparian right is protected as any other right.

[Cited in Conway v. Taylor, 1 Black (66 U. S.) 630.]

9. The right to apply for a ferry license attaches to the riparian proprietor, and this can not be taken from him and given to another without compensation. In principle it is the same right which the land holder has to the soil, or to any benefit appurtenant to the soil.

[Cited in Conway v. Taylor, 1 Black (66 U. S.) 630.]

[1] [Reported by Hon. John McLean, Circuit Justice.]

[2] [Affirmed in Bowman v. Wathen, 1 How. (42 U. S.) 189.]

10. The relief will be given in equity, if it be not complete at law.

11. The owner of land bounded by a navigable river may convey the soil, excepting the right of ferry.

[Cited in Chenango Bridge Co. v. Binghamton Bridge Co., 3 Wall. (18 U. S.) 81.]

12. The difference between a reservation and an exception in a grant. The part excepted is not conveyed, but remains in the grantor, and needs no words of perpetuity.

13. The ferry right is an incorporeal hereditament. It grows out of the soil, and may be granted the same as a rent or an advowson.

14. In such a case the grantee has a right to use the soil for ferryways, but for no other purpose. And for any obstruction of this right he is entitled to a remedy.

15. A ferry right, by the laws of Indiana, may be assigned.

16. The statute of limitations in Indiana does not run against nonresidents. But the complainants may be barred by lapse of time.

[See note at end of case.]

17. Bowman's right of ferry was reserved, or excepted out of the grant made in 1802. A license to keep a ferry, adverse to Bowman's right, was obtained the same year; and Wathen, the defendant. is proprietor of that and two other ferry rights, equally adverse to Bowman's. And the ferry has been kept up from the time it was first granted. Bowman lived in Virginia, but his agent, who executed the conveyance, resided in Louisville, in sight of the ferry, and often crossed in it. A notice to the agent is notice to the principal.

[Cited in Carr v. Hilton, Case No. 2,437; Goodenough v. Warren, Id. 5,534.]

[See note at end of case.]

18. This adverse ferry was in operation twenty-four years before the decease of Bowman, and twelve years after his decease before this bill was filed. The right asserted by the complainants was of a nature to require peculiar vigilance. And not having taken any step to assert their right, until the filing of this bill, they are barred by the lapse of time.

[See note at end of case.]

[In equity. Bill by Isaac S. Bowman, George W. S. Bowman, —— Brinker, Mary Brinker, Rebecca Bowman, and Albert T. Burnley, against Athanasius Wathen and the mayor and common council of the city of Jeffersonville, to enjoin the use of a ferry, and for an accounting. Dismissed.]

Brown and Switser, for complainants.

Mr. Stevens, for respondents.

OPINION OF THE COURT. The complainants claim a ferry right from Jeffersonville, in Indiana, across the Ohio river to Louisville, in Kentucky, which is in the possession and enjoyment of the defendant, Wathen, who claims one half of it, and which the complainants pray, in pursuance of their right, may be decreed to them. The complainants, except Burnley, claim as devisees of Isaac S. Bowman, and he claims as their assignee. Bowman was attached to the regiment commanded by George Rogers Clark, and to whom the state of Virginia granted one hundred and fifty thousand acres of land, lying northwest of the river Ohio. In the cession of lands to the United States,

north of the Ohio river, by the state of Virginia, this tract was reserved. It was located on the Ohio river, at the falls, and includes the city of Jeffersonville. Commissioners were appointed by Virginia, and authorized to allot and convey to the officers and soldiers of the above regiment, according to their respective rights, the above tract. To Bowman was conveyed five hundred acres, on a part of which Jeffersonville now stands.

Bowman was a citizen of Virginia, and, it seems, was never in the territory or state of Indiana. On the 8th of March, 1802, he empowered John Gwathney "to lay off into a town, in any manner he may think proper, one hundred and fifty acres of the above tract, and vest all right and title in discreet persons as trustees of said town. And the attorney was authorized to sell lots, &c., convey to the trustees two acres for a public square, &c., and to do and transact all and any kind of business which may be necessary to carry into effect the foregoing powers." On the 22d day of June, 1802, the plan of the town being made, the attorney conveyed to M. G. Clark and others, trustees of the town, and their successors in office, one hundred and fifty acres, described by metes and bounds, under certain reservations and conditions, among which were the following: "That the said Isaac Bowman shall have, and use for and in his own behalf, whatever right he may now hold as proprietor, to the establishment of one or more ferries." On the plan of the town northeast of Front street, on the river, was left an open space which was marked as commons. On the 12th October, 1802, William H. Harrison, governor of the Indiana territory, granted a license to M. G. Clark, one of the grantees in the above deed, a license to keep a ferry at the town. And on the 2d July, 1807, he granted a license to one Joseph Bowman, also, to keep a ferry at the same place. In 1820 the legislature of Indiana sanctioned the ferry right to George White, originally granted to him. Bowman continued to reside in Virginia until his decease, in 1826. He devised his real estate, in Virginia, Kentucky, and Indiana, in connection with which this ferry right was named, to his children in certain divisions. Under the will the complainants named as devisees took the lands in Indiana, including the ferry right. One of the children of the deceased is still a minor, and they have all continued to reside in Virginia. On the 11th May, 1839, the devisees, for the consideration named, of twenty thousand dollars, conveyed the ferry right, and the lands, &c., in Indiana and Kentucky, devised to them by their father, to their co-complainant, Burnley.

The three ferries, granted as above stated, are now consolidated into one, and the defendant, Wathen, by conveyances from the original grantees, and those who claimed un-

der them, is vested with one half of the interest of the ferry. The persons who own the other half are citizens of Kentucky, and can not be made parties to the suit; and this is assigned, in the bill, as a reason why they are not made parties. From the answer of Wathen, it would seem that the ferry, by the loss of ferryboats, steamengines, &c., has been unprofitable until last year. Various grounds of defence are alleged in his answer, and, also, in the answer of the mayor and common council of the city of Jeffersonville, which will be hereafter considered. In the commencement of the argument the complainants' counsel notify the court, and the respondents' counsel, that, on the present bill, they shall claim the ferry right only. Indeed, this is distinctly avowed in the bill.

It is objected by the respondents' counsel that, by uniting the devisees of Bowman and Burnley as complainants, there is a misjoinder which must be fatal to the right asserted in the present form of proceeding. The objection is not that there is a want of proper parties, but that Burnley having received a conveyance, by deed, of all the interest of the devisees of Bowman to the right in controversy, the devisees are not necessary parties. There are cases in which a want of proper parties may be alleged at the hearing. All necessary parties must be before the court, unless it be shown, in the bill, that they are not within the jurisdiction of the court. And although the court will not dismiss a bill which is defective in this respect, they will suspend the decree, and direct the cause to stand over to bring in the proper parties. Milligan v. Milledge, 3 Cranch [7 U. S.] 220. In the case of Carneal v. Banks, 10 Wheat. [23 U. S.] 181, the court held—"The circumstance that some have been improperly joined as defendants in the bill, can not affect the jurisdiction of the circuit court as to other parties who are properly before it." And in Wilkinson v. Parry, 4 Russ. 272, it was decided that an objection that some of the plaintiffs have no interest can not be made at the hearing.

It must be observed that the right asserted in the bill, whether asserted by Burnley or his co-complainants, the devisees of Bowman, is the same right. Burnley, it is true, claims under a deed, but from the facts stated in the pleading, it would seem that, at the time this deed was executed, there was possession of the land conveyed to which this ferry right is appurtenant. And if, as the defendant's counsel insists, this possession was adverse, the deed to Burnley conveyed no title. It is believed that in Indiana there is no statute which prohibits the sale of pretended titles. But the statute of 27 Hen. VIII. was in affirmance of the common law. And in Co. Litt. 369, it is laid down, if a person out of possession convey land which is held adversely, the conveyance is void. 9 Johns. 55; Partridge v. Strange, 1 Plow. 77; Fite v. Doe, 1 Blackf.

127. Now, although the mere ferry right, which is an incorporeal hereditament, may not be capable of an adverse possession within this principle, except as appurtenant to the land; yet the state of the title was such as to render it prudent, and, as we think, proper, to make the devisees of Bowman co-complainants with Burnley. And there are considerations, independently of this, arising out of the election of the devisees, under the will of their ancestor, as to this ferry right, and other facts connected with their title, which make them necessary parties. But, if this were not the case, the court would permit the complainants, even at the hearing, to strike out the names of the devisees, if necessary to the exercise of jurisdiction. Such an amendment of the bill could not take the respondents by surprize, or subject them to any change in their defence. But if the deed to Burnley be inoperative as a conveyance of the title, the devisees of Bowman would be indispensable parties. If Burnley can set up only an equity, it is necessary for him to make those from whom he claimed such equity parties to the suit. Findlay v. Hinde, 1 Pet. [26 U. S.] 241; Smith v. Shane [Case No. 13,105]. We think that the objection of a misjoinder, as made by the defendants, can not avail them.

The rights of riparian proprietors are so well defined, and have been so fully investigated by the supreme court, that little need now be said to show their nature and extent. In the cases of Cincinnati v. Lessee of White, 6 Pet. [31 U. S.] 431, Barclay v. Howell's Lessee, Id. 498, and Mayor, etc., of New Orleans v. U. S., 10 Pet. [35 U. S.] 662, the doctrine is examined. Where land is bounded by a watercourse these rights attach to the proprietor. And it is immaterial whether the watercourse be a navigable river or a smaller stream; or, whether the proprietor be a corporation or a natural person. In the case of Tyler v. Wilkinson [Case No. 14,312], Mr. Justice Story says—"Prima facie, every proprietor upon each bank of a river is entitled to the land covered with water, in front of his bank, to the middle-thread of the stream." The judge is here speaking of a river which is not navigable, and such is undoubtedly the common law. In the Case of the Royal Fishery in the River Banne, Dav. Ir. K. B. 55, 57, it was resolved, that by the rules and authorities of the common law, every river, where the sea does not ebb and flow, was an inland river not navigable, and belonged to the owners of the adjoining soil. The same doctrine is found in Carter v. Murcot, 4 Burrows, 2162, and in King v. Wharton, 12 Mod. 510; and Sir Matthew Hale, in his Treatise De Jure Maris, &c. Hargrave's Law Tracts lays down the law, generally, that fresh rivers, of what kind soever, do, of common right, belong to the owners of the adjacent soil; but he admits that such rivers may be un-

der a servitude to the public, and regarded as common highways. This doctrine is fully recognized by Chief Justice Kent, in the case of Palmer v. Mulligan, 3 Caines, 318.

We apprehend that the common law doctrine, as to the navigableness of streams, can have no application in this country; and that the fact of navigableness does, in no respect, depend upon the ebb and flow of the tide. Where a stream, which is clearly not navigable, forms the boundaries of proprietors on each side of it, under the common law, each may claim to the middle of the ·stream. But this right can not be exercised to the injury of other rights of the same nature. On navigable streams the riparian right, we suppose, can not extend, generally, ·beyond high water mark. For certain purposes, such as the erection of wharfs, and other structures, for the convenience of commerce, and which do not obstruct the navigation of the river, it may be exercised beyond this limit. But, in the present case, this inquiry is not important. It is enough to know that the riparian right on the Ohio river extends to the water, and that no supervening right, over any part of this space, can be exercised or maintained, without the consent of the proprietor. He has the right ·of fishery, of ferry, and every other right which is properly appurtenant to the soil. And he holds every one of these rights by as sacred a tenure, as he holds the land from which they emanate. The state can not, either directly or indirectly, divest him of any one of these rights, except by a constitutional exercise of the power, to appropriate private property for public purposes. And any act of the state, short of such an appropriation, which attempts to transfer any ·of these rights to another, without the consent of the proprietor, is inoperative and void. It can afford no justification to the grantee against an action of trespass.

In coming to this conclusion, we have deemed it unnecessary to look particularly into the laws of Virginia, under which the title in question was derived; to the compact between Virginia and the other states, at the cession of the territory northwest of the Ohio, or to the ordinance of 1787. The principles laid down are of common right. In this country they are every where recognized. They belong as well to the civil, as the common law. The title of Isaac Bowman was derived from the state of Virginia, not only before Indiana was known as a territory, but before the organization of the Northwestern Territory. His rights, whatever they were, can have been, in no respect, affected by the direct action of the territorial government, or of the state government, which succeeded it. Where a state grants land, it may impose any restrictions, which shall be deemed proper, on the grantee. But where the grant is without restriction, as in the present case, the grantee holds the land, and all the appurtenances which belong to it. Some of the rights which appertain to the soil are of a public nature, and the use of them are, consequently, subjects of legal control. Of this character is the right of ferry, the right of wharfage, and others which might be enumerated. Any man has a right to keep ferry boats, for his own convenience, upon his own land. But he is under no obligation to afford any amount of accommodation to the public. And, for this, the government is not only authorized, but bound, to make suitable provision. On this ground, licenses to keep ferries are granted, and the grantees are bound to keep suitable boats, give the requisite attention, and, in all other respects, to comply with the requirements of law. In Indiana, and in many other states, the grantee of a ferry is required to give bond and security, for the performance of his duties. His charges are also regulated by law. To protect the grantee in his rights, and remunerate him for the money expended, and the responsibilities incurred, no other person, without a license, is permitted to set up a rival ferry, which shall lessen the profits of the first one. Nor, indeed, can the state consistently, if at all, grant a new ferry, to the material prejudice of an old one, unless the public accommodation shall require it.

The legislature of Indiana have not assumed the right to grant a ferry license, except to the proprietors of lands on the borders of rivers, &c. In 1807 a law to this effect was passed, authorizing the court of common pleas to make the grant. In 1815 a law authorized the county courts to establish ferries on the Ohio river, under the above restriction, and required bond to be given, &c. And, in 1817, the board of county commissioners were empowered to grant licenses, for ferries, to the proprietors of lands on the margin of a river, &c. The third section of this act [Sess. Laws, 292] provided "that when the land on the margin of a river should be a public common of a town, that the board of commissioners might grant a ferry license to any proprietor of land next adjoining the said public common." But, at the same session, a supplemental act was passed, declaring "that nothing in the said 3d section should affect the right of any town or corporation, or the right of any person, proprietor of any town, by reason of any grant of ferry license to a person who was not a proprietor of land on the margin of the river." [Act Jan. 24, 1818;· Sess. Laws, 296.] By these acts, the legislature of the state of Indiana has fully recognized the ferry right of the proprietor on the margin of the river, as above stated. And, indeed, the act of 1817, declares that such right shall not be prejudiced by the grant of a ferry license to one who is not a proprietor of lands adjoining the river.

In the argument, it was supposed that the recognition of this principle would operate most injuriously to the public—that it would

be in the power of any proprietor to prevent the establishment of a ferry upon his land; but, it will be observed, that the same principle applies to the establishment of public roads, canals, and almost every description of public improvement. No man's property can be taken, for these purposes, against his will, unless compensation be made. And this is the rule in regard to ferry ways. These, no more than the other real estate of the proprietor can be taken without his consent, unless they shall be taken, and paid for, under the power of appropriation. The respondent's counsel insists that, if the legal right of the complainant, Burnley, be as stated in the bill, he has full and adequate relief at law. There can be no doubt that, where an injury is done to an established ferry, an action at law would be the appropriate mode of redress. But that is not the case made in the bill. What redress can an action at law give to the complainants, should the right, asserted, be sustained? The defendant, Wathen, under color of right, at least, is in possession of the ferry. He claims under the original grantees, and in virtue of a right which has been exercised and sanctioned by public authority nearly forty years. This right has the proprietorship of the soil to support it. The claim in the bill is hostile to this, and, if sustained, must rest upon the reservation in the deed of Bowman, by his attorney, to the original trustees of the town. And, on this ground, the exclusive ferry right, appurtenant to the hundred and fifty acres, is asserted. Since 1802, this right has been dormant. For aught that appeared to the public, or to the owners of the different ferries established at Jeffersonville, it had been abandoned. Under such circumstances, it was the duty of the public authority to provide for the general accommodation. This was done; and we think, under the circumstances, was rightfully done. And now that this dormant ferry right is set up, if its validity be admitted, how can effect be given to it? Not, certainly, by an action at law. This can neither enjoin the defendants, nor transfer their receipts, nor their ferry rights, to the complainants. And, if relief be given, it must be in one of the modes here stated. It is, therefore, clear that the remedy is not at law.

A great number of other questions are made in the answer, and by the defendant's counsel, in argument, more or less important; but they will be passed over, and the great questions in the cause will be considered: and these are, the nature and extent of the ferry right reserved by Bowman, and the lapse of time. This deed was executed by Gwathney, the agent of Bowman. On looking into his authority, which is in writing, and in evidence, there can be no doubt he possessed the power to make the deed. And now we will consider the reservation or exception, as it is called, in the deed. As this is an important point in the case, it may be proper to advert to such parts of the deed as can have any bearing on the question under consideration. The deed conveys to certain persons, named as trustees of the town of Jeffersonville, "and to their successors in office, to the use, interest and purposes, hereinafter expressed, and to and for no other use, interest or purpose, whatever, that is to say: the said John Gwathney, as attorney, in fact, for the said Isaac Bowman, shall have, retain, possess and exercise, the sole, entire and exclusive right and privilege, of making applications of the moneys arising from the sale of the lots of the said town; and shall, also, have and use, for and in behalf of the said Isaac Bowman, whatever right he may now hold as proprietor to the establishment of one or more ferries." The deed then states the boundary of the one hundred and fifty acres, beginning at a stake on the bank of the Ohio river; running thence up the river, and binding thereon, &c. To have and to hold the beforementioned tract, or parcel of land, under the conditions, limitations, reservations and restrictions, before mentioned, and the said public square aforesaid, for the purposes aforesaid, to the said trustees, and their successors in office, forever. Then follows the clause of warranty. In the body of the deed is stated that the attorney had laid off the one hundred and fifty acres in a town, and drawn a plan of it, designating two acres of ground as a public square, with convenient streets and commons, and called it Jeffersonville. These are all the parts of the deed which can have any supposed bearing upon the reservation of the right in question. From the trustees, Bowman received a conveyance for lots 190, 191 and 192, which are bounded on the river, and which were retained by him and passed to his devisees, who have conveyed the same to the complainant Burnley. The title to these lots, however, is, in no respect, connected with the ferry right under consideration. From Front street, to the upper limit of the town, an open space is left, between Water street and the river, which, on the plan of the town, is called "Commons." On these commons is the landing and ferry ways of the defendants. There can be no doubt that this designation, on the plan of the town, and, also, the two acres for a public square in the centre, taken in connection with the deed of Bowman to the original trustees, which deed and plan were recorded, constituted a dedication of the square and the commons to the public. That the trustees could have no succession, they not being incorporated, is no objection to this view. The trustees, or, at least some of them, are believed to be still living. To the purchasers of lots they conveyed titles, as they undoubtedly had the power to do. No act of dedication could be more formal, or more solemn, than the deed and the plat in this case. And, if any confirmation were necessary, the use of the commons and of the

public square for thirty eight years, as such, may be referred to. This public use would, of itself, be evidence of a dedication. On the fact of dedication, there can be no doubt.

It is insisted that the reservation of the ferry right, being inconsistent with the grant, is void. · But is it inconsistent with the grant? The commons extended from Water street to the river, and the fee to this space, by the dedication, as completely passed out of Bowman and vested in the public, for the use declared, as if the most formal conveyance had been executed. But, in addition to this, the fee was actually conveyed to the original trustees. The town, then, when it became incorporated, and, indeed, before, was entitled to the use of these commons to the water. But that this use is not at all inconsistent with the use of the commons for a ferry landing, is shown by the fact that they have, from the first, been used as such. The defendants' counsel suggests, that this ferry right can only subsist in connection with the soil. It is a right connected with the soil, and grows out of it, the same in principle as an advowson or rent. It is an incorporeal hereditament, and lies in grant. Co. Litt. 335b. When the ownership of it is not connected with the ownership of the soil no one can have seizin of it as of land. But, still, it is classed with real estate, and is subject to the laws which govern the realty. And so is rent, or an advowson. An advowson appendant may become in gross, by various means. 1. If the manor. to which it is appendant, is conveyed away in fee simple, excepting the advowson. 2. If the advowson is conveyed away without the manor, to which it is appendant. 3. If the proprietor of an advowson appendant, presents to it as an advowson in gross.· 1 Dyer, 103; 4 Cruise, Dig. 3. The existence of an advowson, like that of every other incorporeal hereditament, being merely in idea and abstracted contemplation, it is not capable of corporeal seizin or possession. 4 Cruise, Dig. 5. A person having free warren over certain lands, may alien them, reserving the warren. 1 Dyer, 30b, pl. 209. A rent may be reserved upon a grant of an estate in remainder or reversion; for, though the grantee can not distrain during the continuance of the particular estate, yet there will be a remedy by distress, whenever the remainder or reversion comes into possession. 1 Co. Inst. 47a. Rent may be reserved on a conveyance of lands in fee simple, and this is called a fee farm rent. The statute of Indiana recognizes the right of the proprietors of lands on the margin of the river, and to none others can ferry rights be granted; and, it is supposed, that this limits the right to the grantee of the soil. But this construction of the statute can not be sustained. By the statute, nothing more could have been intended than to rescue, from violation, the right of the riparian proprietor. This right is appurtenant to the soil; but he

may convey it, and still retain the fee in the land. And, by such conveyance, the grantee holds the right which the statute was designed to protect. He has the use of the soil for a ferry landing, and for ferry ways, so far as the public accommodation is concerned, as fully and completely as could be exercised by the grantee of the soil; but for no other purpose has he a right to enter upon the soil. Now, it must be perceived, that the right thus possessed, is as much within the policy of the statute, as if it were a fee simple in the soil. Indeed, it is within the letter of the statute. For the grantee of such a right may, in the strictest sense, be considered, for all the purposes of the ferry, "the proprietor of land on the margin of the river." This right, as before remarked, is real estate. It descends to heirs, as such, is subject to dower, and to all the incidents of real property.

We come now to consider the operative words of the reservation. "And (the attorney) shall also have and use, for and in behalf of the said Jacob Bowman, whatever right he may now hold as proprietor, to the establishment of one or more ferries." That this reservation gave to Bowman, during his life, this ferry right, there can be no doubt. We have shown that it may be separated from the fee in the soil, and still be within the policy and language of the statute. But Bowman is now deceased, and the inquiry is, was the right reserved to his heirs? It is admitted that the word heirs is not necessary, in every possible case, in a reservation or grant, to give an estate of inheritance. If the father infeoff the son, to have and to hold to him, and to his heirs, and the son infeoffeth the father as fully as the father infeoffed him, by this the father hath a fee simple. Co. Litt. 501. When the act of disposal relates to another thing, that thing becomes, in a manner, part of the disposition, and, in such case, the mind is carried to the idea of an heir, as clearly as if the word "heir" had been inserted in the feoffment. 3 Bac. Abr. 534. Where a man, seized of land in fee, made a lease for years, reserving rent to him and his assigns during the term, it was adjudged that this reservation should not determine by the death of the lessor, but the rent should go to the heir. Sacheverell v. Froggatt, 2 Saund. 367; Harg. Co. Litt. note 8, p. 47a; Sury v. Brown, Latch. 99, 100; Vent. 163; 2 Lev. 13. If one coparcener or joint tenant releases all his right to another, it will pass a fee without the word heirs. So if one coparcener grants a rent to the other, for equality of partition, an estate in fee simple in the rent will pass without the word heirs; for, as the rent comes in lieu of the inheritance, it has as strong a relation to the inheritance as if the word heirs had been used. 1 Co. Inst. 10; 4 Cruise, Dig. 295. But these are exceptions to the general rule, and the cases put can admit of. no doubt as to the intention of the parties.

We will now cite cases where the word heirs, in reservations, has been held necessary to constitute an estate in fee simple. If a rent be reserved to the lessor and his assigns, it will determine at his death; for the reservation is good only during his life. So, if a rent is reserved to him and his executors, he having the freehold it will be determined at his death; because the reversion to which the rent is incident descends to the heir. 1 Co. Inst. 47, a; 1 Vent. 161; 3 Cruise, Dig. 319. If one grant lands or tenements, reversions, remainders, rents, advowsons, commons or the like, and express or limit no estate, the lessee or grantee hath an estate for life only. Dyer, 300. A reservation sometimes operates as a grant, but this cannot be the case with an exception. An exception, says Sheppard's Touchstone, 77, is where the grantor excepts something out of that which he has before granted, by which means it does not pass by the grant, and is reserved from the things granted. "And note," says Lord Coke on Littleton 412, "a diversity between an exception, which is ever a part of the thing granted and of a thing in esse, for which exceptio salvo, praeter, and the like, be apt words; and a reservation which is always of a thing not in esse but newly created or reserved out of the land or tenement demised. Poterit enim quis rem dare et partem rei retinere, vel partem de pertinentiis, et illa pars quam ratinet sem percum es est et semper fuit." Here Coke states that a reservation is always of something not in esse; but the inaccuracy of this is shown in his own words in a different section. "Reserve," he says, "cometh of the Latin word reservo, that is to provide for store; as when a man departeth with his land, he reserveth or provideth for himself a rent for his own livelihood. And sometimes it hath the force of saving or excepting. So, as sometime, it serveth to reserve a new thing, viz.—a rent, and sometime to except part of the thing in esse that is granted." Id. 143a.

The words exception and reservation are used synonymously in grants, and have the same effect. The effect of the deed does not depend upon the use of the one or the other of these terms, but on the facts which they represent. In the case of Greenleaf's Lessee v. Birth, 6 Pet. [31 U. S.] 310, the court say in order, therefore, to ascertain what is granted, we must first ascertain what is included in the exception; for whatever is within the exception is excluded from the grant. Suppose, in conveying to the trustees the one hundred and fifty acres, the attorney of Bowman had excepted, from the operation of the deed, any given number of lots, as designated on the plan of the town, would these lots have passed by the deed? Being excepted, out of the land conveyed, they could not have passed. They would then have remained in Bowman, unaffected by the deed. Of this, it is supposed, no one

can doubt. And the only inquiry now is, whether the ferry right reserved is of the same nature, in this respect, as a part of the land. In what does it differ? It is appurtenant to the soil, and constitutes no inconsiderable part of its value. As has been shown it is susceptible of a different ownership from the soil. It is still a right growing out of the soil, and subjects it to the servitude in whosever hands it may come. Although an incorporeal hereditament, in contemplation of law, it is property, real property. It passes by deed—is assets in the hands of heirs, and, in all respects, is subject to the laws which regulate real estate. It is readily admitted if this were a grant to Bowman, the words of the reservation would give him but a life estate. But the right remained in Bowman. He did not part with it; and it remained in him the same as before the deed to the trustees was executed. He conveyed the land to which this right was appurtenant, but he conveyed it charged with the servitude of this ferry right, which he excepted or reserved. If Bowman derived his right from the deed, words of inheritance would have been essential to give him a fee simple. But he has the same ferry right after the land was conveyed as before it. He excepted it out of the deed, and nothing more was necessary to retain the right unimpaired by the conveyance.

It is insisted that a license to keep a ferry is personal, and cannot be assigned. That as the right of the defendant, Wathen, rests upon transfers from the original grantees, and has no other foundation, it must be held invalid. In this respect no difference is perceived between a ferry franchise, the franchise of a tollbridge, a turnpike or railroad, or any other franchise of the same nature. Certain privileges are given by the state, and the grantee becomes bound to afford the proposed public accommodation. It is true, the grant is made in the one case to a private individual, and in the others to corporations. But as it regards any matter of public confidence, it would seem to apply as strongly to the individuals incorporated, as to the grantee of the ferry. But the grantee of the ferry has a right appurtenant to the soil which, by the law, is made an indispensable pre-requisite to a ferry license. Now we have shown that the ownership of this right may be separated from the ownership of the soil; and if this may be conveyed by the grantee before the ferry license is obtained, may it not be conveyed afterwards? And in this conveyance may not the ferry grant be included? The public can have no claim on the grantee beyond the requirements of the law; and it is immaterial whether these are fulfilled by the grantee or his assignee. It is probable that the assignee gives a bond and security, as the law requires, or indemnifies the grantee. There must be some settled practice on this

subject, which has been so sanctioned, as to become a rule of property. However this may be, there would seem to be no doubt, that the ferry franchise, with all that belongs to it, may be taken by descent or by conveyance the same as other interests which pertain to the realty. Where an office is conferred which implies personal confidence and a capacity to discharge public duties, no assignment can be made of it. But this has no analogy to the franchise in question. This question, however, does not depend upon general principles; the statute of Indiana authorizes the transfer of the ferry license, and points out the duties of the assignee. If the ferry shall not be kept up, it may be vacated and annulled on a mode of proceeding authorized by the statute. But the license is granted without limitation, and subject only to the condition that the requirements of the law shall be observed.

The lapse of time is the only question that remains for consideration. The ferry franchise claimed by the defendant, Wathen, originated in October, 1802. This right was sanctioned by the legislature of Indiana by an act passed December, 1820. Another ferry license granted subsequently to 1802, and to a different person, is now, and has been for several years past, by mesne conveyances, vested in the defendant, Wathen, and others, who are not made parties to this suit. Wathen owns one half the interest in the consolidated ferry. This ferry has been regularly kept up, and the requirements of the law observed from 1802 up to this time, making thirty nine years, and nearly thirty eight years to the time of filing the bill. Bowman's deed to the trustees, in which the ferry right was excepted, was recorded by the recorder of Clark county shortly after it was executed. Bowman continued to reside in Virginia until his decease, in 1826, and his devisees still reside there. The agent Gwathney, who executed the deed was, at the time, a citizen of Louisville where he continued to reside many years; being often in Jeffersonville, saw the ferry in operation, and frequently crossed in it. One of the witnesses states, shortly after the town of Jeffersonville was established this reserved ferry right was spoken of; and another witness, some two or three years after, 1826, heard the same right mentioned among the citizens. At this time Wathen was a citizen of Jeffersonville.

Against the operation of the statute of limitations and of lapse of time, the complainants' counsel insist—

First: That the statute does not run against nonresidents.

Second: That time in equity is applied by analogy to the statute, and that it cannot bar the complainants' right as Bowman was not only a nonresident but several of his devisees at his death were infants, and some of them are still minors.

Third. That the ferry right, set up by the

defendant, Wathen, was not established by competent authority, and that the sanctions since given to it, were in violation of the rights of the complainants, and were consequently void.

Fourth. That the defendant, Wathen, stands as trustee in relation to the right of the complainants, and that in such a case neither the statute of limitations nor the lapse of time can have any effect.

That the statute does not run against nonresidents must be admitted. It only operates against those who are residents of the state, or who may come within its jurisdiction. And it must also be admitted that by analogy the statute is applied in equity as at law, and that in such cases it does not bar the rights of infants. But time in equity often operates as a bar in a case where, at law, the statute could have no effect. And the case under consideration may illustrate this principle. The lapse of time is open to the defendant as a ground of defence, although by reason of the nonresidence of the complainants the statute could have no effect against them at law. This doctrine is fully established. In the case of Piatt v. Vattier [Case No. 11,117], many authorities on this point are cited. That case was similar to this one. The holder of the title was a nonresident and his right was not barred by the statute. In the case of Marquis of Cholmondeley v. Lord Clinton, 2 Jac. & W. 138, the court say, "At all times courts of equity have, upon general principles of their own, even where there was no statutable bar, refused relief to state demands, where the party has slept upon his rights, and acquiesced for a great length of time." And this doctrine was sanctioned by the supreme court on an appeal of the above case of Piatt v. Vattier, 9 Pet. [34 U. S.] 416. It is, also, sustained in the following cases: Beckford v. Wade, 17 Ves. 86; Barney v. Ridgard, 1 Con. Cus. 145; Blennerhassett v. Day, 2 Ball & B. 104; Hardy v. Reeves, 4 Ves. 479; Harrington v. Smith [28 Wis. 43]; 1 Brown, Parl. Cas. 95; Kane v. Bloodgood, 7 Johns. Ch. 93; Prevost v. Gratz, 6 Wheat. [19 U. S.] 481; Hughes v. Edwards, 9 Wheat. [22 U. S.] 489; Willison v. Watkins, 3 Pet. [28 U. S.] 44.

Is the franchise of the defendant invalid on the third ground assumed? Was the license granted in 1802 inoperative, and were the sanctions of the legislature subsequently given to it of no effect? The license was first granted by the governor of the territory without any express authority of law. At that stage of the territorial government he was, in connection with the judges, authorized to adopt laws of the states, but not to enact them. No law, it seems, could be found applicable to the public emergency, and a resolution was adopted under which the license, in 1802, was granted. In 1807 the territorial legislature provided "that all ferries now kept by license from the governor, shall be and are hereby declared to be es-

tablished ferries," &c. Another confirmatory act was passed by the legislature the 26th December, 1815. And, afterwards, in December, 1820, the legislature of the state confirmed, by a special act, the franchise under which the defendant claims. It may be proper here to remark that the case cannot be made to turn upon the validity of the defendant's right unconnected with the lapse of time. But this will be more appropriately considered under the next head. The right from the first was, at least, prima facie. And it may be a matter of doubt whether the power exercised by the governor, under the emergency which existed, ought not to be sustained. And this view is greatly strengthened, if, indeed, it be not placed beyond doubt, by the confirmatory acts of the territorial and state legislatures. But it is supposed that the ferry right reserved by Bowman renders the acts of the governor, and of the territorial and state legislatures, inoperative and void. And this upon the ground that private property can not be appropriated for the public use without compensation. Where was this right of the complainants for thirty eight years, while this ferry has been kept up by the enterprise of its owners, and enjoyed by the public? All that could be known of it, by searching the county record, was, that Bowman reserved it in his deed to the trustees. But what evidence was this of his continued ownership? That an individual did not convey an interest, that he might have in land, to A, is no very satisfactory evidence, some twenty or thirty years afterwards, that he had not sold it to some other person. At best it was a right that existed in idea. An abstraction. Something that could neither be seen nor felt. Of which no one could have corporeal possession. And yet this intangible thing, in the estimation of the counsel, becomes the vis major to the power of the territorial government, and the sovereignty of the state. It resists, and effectually resists, all action for the public good. That such can not have been the effect of this ferry right, under the circumstances, is very clear. No such dormant interest, practically abandoned, can be asserted after the lapse of nearly forty years, to nullify the action of the government. If it were not barred by the lapse of time, it could not make the grantees of the government trespassers. Where a case of prima facie right to a ferry license is made out the state, is, in duty bound, to grant a license, should the public convenience require it. And if there be any conflicting right, the owner is bound to assert it in a reasonable time. If he fail to do this the other title is strengthened by time, and may bar that which, at first, was a paramount title.

But is the defendant, Wathen, prohibited from setting up this defence by the relation he bears to the complainants' title? Is he the cestui trust of the complainants, or, did those under whom he claims stand in that relation to Bowman? That the statute does not run against an established and continuing trust is clear. For, in that case, the possession of the trustee is consistent with the right of the cestui que trust. And neither the statute of limitations, nor the lapse of time, can, in such a case, operate in favor of the possession of the trustee. But where his possession is hostile, openly and avowedly hostile, the rule is very different. There can be no stronger case put to illustrate this doctrine, than that of landlord and tenant. On general principles the tenant is not permitted to dispute his landlord's title. Having entered under that title, he can set up no adversary title to protect his possession. And yet if he publicly disclaim his landlord's title, and profess to hold under a hostile title, the statute of limitations will begin to run from the time of such disclaimer. This doctrine is sanctioned in the case of Willison v. Watkins, 3 Pet. [28 U. S.] 47, 48. In that case the court say—"the same principle applies to mortgagor and mortgagee, trustee and cestui que trust, and, generally, to all cases where one man obtains possession of real estate belonging to another by a recognition of his title." 6 Johns. 272; Blight's Lessee v. Rochester, 7 Wheat. [20 U. S.] 535, 549. Where the trustee denies the title of the cestui que trust the statute will operate. To prevent this the trust must be subsisting. Kane v. Bloodgood, 7 Johns. Ch. 90; Lockey v. Lockey, Prec. Ch. 518; Harmood v. Oglander, 6 Ves. 199; Hovenden v. Lord Annesley, 2 Schoales & L. 630. The right under which the defendant claims, from its origin, has been hostile to that asserted by the complainants. So far as the defendant has become seized of any part of the soil bounded by the river, included in the deed of Bowman to the trustees, it might be contended that he was seized to the use of the complainants. But the claiming and exercising of the ferry franchise, is utterly inconsistent with the right set up under Bowman. They can not both exist. The one necessarily excludes the other; and, by consequence, they are hostile to each other. An uninterrupted possession has been held by the defendant, and those under whom he claims, of thirty nine years —of thirty eight years before the commencement of this suit, and about twenty four years before the decease of Bowman. And what are the circumstances relied on to obviate the effect of this lapse of time? The nonresidence of Bowman, his death, and the infancy of some of his devisees.

As before remarked, nonresidence saves the operation of the statute, but not the effect of time. That Gwathney, the agent of Bowman, who executed the deed to the trustees, and who superintended the sale of the town lots; and especially reserved this ferry right, as attorney, in fact, for Bowman, to be used for him, remained many years a res-

ident at Louisville, after the execution of the deed, is an important fact. He was the special agent of Bowman, as appears from the deed; not only as regards the Jeffersonville property, but of this right in particular. He saw the ferry of Clark in operation in a very short time after the deed was executed; was frequently in Jeffersonville, crossing in the ferry, and it does not appear that he ever remonstrated against its establishment, or attempted to set up the right reserved to his principal. And with the same indifference he daily witnessed the operations of this and the other ferry for fifteen or eighteen years. A notice to the agent is notice to the principal, 13 Ves. 121; 1 Ves. Sr. 62; 1 Term R. 16; Amb. 626; 4 Term R. 66. And the rule here applies with peculiar force. For there is a strong probability that Gwathney reserved this ferry right without any special instructions from Bowman. He was then peculiarly fitted to protect it, and it was his duty to do so. The lapse of time could not more strongly have operated against the complainants' title, had Bowman resided in Louisville instead of his agent.

There is another consideration entitled to great weight, and that is the nature of the right. It was one connected with the public accommodation, and which the owner must have known, unless exercised, might be lost. By the 2d section of the act of the 17th September, 1807, the court of common pleas was authorized to discontinue a ferry if not used for twelve months. The foundation of the right was appurtenant to the soil, but the exercise of it depended upon the sanction of the public authority. Diligence was required, then, not only in procuring the public sanction, but, also, in keeping up the ferry. But nothing was done until a very short time before the bill, in this case, was filed. A demand was then made of the defendant, Wathen, that he would surrender the ferry, and his boats, &c., on the terms stated in the bill. When the ferry was first established, and for many years subsequently, it was not profitable. To some of the proprietors it seems to have been rather a source of expense than profit. And this may be a reason why Bowman's right was not asserted. But now that Jeffersonville has become a thriving city, the country thickly populated, and the city of Louisville a place of great commercial enterprise, the ferry has become profitable. Steamboats are used in the ferry which cost from fifteen to twenty thousand dollars. From morning until night a continued line of travel is passing over it. It has become an object of importance, and an increasing source of wealth.

Neither lapse of time nor the statute operates against infants. And yet if the statute begins to run in the life of the ancestor, it will continue to run after his decease against his minor heirs. And in the case under consideration, after the exercise of this adversary right twenty four years, without molestation during the life of Bowman, it is difficult for the court to close their eyes against the lapse of twelve years which has since occurred. During this period some of the devisees were minors, but the greater part of them were of full age.

Upon the whole, when we consider the nature of this right, its origin, the long residence of Bowman's agent, who reserved it, in full view of the ferry, and the great lapse of time, we are led to the conclusion that no relief can be given to the complainants. They have not, nor did he, under whom they claim, use the diligence which the law imposes for the protection of the right asserted. It is one which, of all others, would seem to impose diligence. Public convenience united with private interest to recommend this course. But both considerations were disregarded. The right has become very valuable. But in the hands of the complainants it has become stale. And such was its character on the decease of Bowman. The bill is dismissed at the complainants' costs.

NOTE [from original report]. This decree, on an appeal to the supreme court, was affirmed January term, 1843. [Bowman v. Wathen, 1 How. (42 U. S.) 189.]

[NOTE. In affirming the decision herein, Mr. Justice Daniel, after discussing the various questions raised by appellants, placed the determination of the court upon the ground that the complainants were barred by lapse of time, and that knowledge of the alleged invasion of complainants' rights was notice to complainants and their devisee, and stated:

["The real question involved touches neither the definition of ferry privileges nor the modes of their enjoyment, but relates exclusively to the propriety of interfering, at the instance of the complainants below, with those rights as they now are and have been enjoyed by the defendants, and of transferring such rights and enjoyment to the complainants themselves.

["Gwathney, the agent, resided in the immediate neighborhood. From his agency in laying off and selling the lots he was necessarily connected with the affairs of the town; and it is shown beyond question that he had knowledge of the existence of the ferry, and had actually used it at an early period after its establishment, though the precise time when is not ascertained. * * * If Bowman, by negligence, or by failure to look after and protect his own interests, permitted the title of another to grow into full maturity, he thereby recognized the force of the principle of the bar by lapse of time, which created a title as complete in equity as would be imparted by an express conveyance. This conclusion follows by regular deduction from all the authorities upon this doctrine of lapse of time. * * * We consider the pretensions of the complainants below (the appellants here) to be, upon every correct view, within the operation of the equitable bar by lapse of time." Bowman v. Wathen, 1 How. (42 U. S.) 189.]